UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | )<br>)<br>) |
| v. | ) Crim. No. 05-10226 RWZ<br>) |
| SAMNANG AM<br>    Defendant. | )<br>)<br>) |

**GOVERNMENT'S OPPOSITION
TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

The United States of America, by and through the undersigned Assistant U.S. Attorney, hereby files its Opposition to the *Motion to Suppress Evidence and Statements* filed by the defendant Samnang Am (hereinafter, "Defendant" or "Am") on July 24, 2006. For the reasons set forth below, Defendant's motion lacks merit and should be denied.

## I.   RELEVANT FACTS

Am is charged with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Specifically, the indictment alleges that on or about May 26, 2005, in Lynn, Massachusetts, Am, having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, possessed in or affecting commerce:

(1)   a FIE Titan .25 caliber pistol, bearing serial number ED95520, and

(2)   six rounds of PMC .25 automatic ammunition.

A summary of the facts underlying this charge follows:[1]

---

[1] These facts are based on testimony that the government expects to elicit at the hearing on Defendant's motion to suppress. The government recognizes that fundamental differences exist between the government's statement of facts and the factual assertions set forth in Defendant's Affidavit. A hearing is therefore necessary.

On May 26, 2005, Sergeant Michael Vail and Officer Michael Kmiec of the Lynn Police Department were in a marked police cruiser in the area of Essex Street in Lynn, Massachusetts. Both officers had extensive experience in patrolling and making arrests in this area. This high-crime area is plagued by violent crime and gang activity, including murders, attempted murders, assaults, drug transactions, and shootings. Sergeant Vail and Officer Kmiec were in a cruiser assigned to the Lynn Gang Unit and were responsible for patrolling the area with a focus on gathering information regarding gang activity in Lynn and preventing any gang violence that night.

At approximately 7:00 p.m., the officers noticed Am walking down Essex Street in a southerly direction. Sergeant Vail knew that Am was a member of the "Oriental Street Boyz" ("OSB") gang and had carried weapons, including guns, in the past. Sergeant Vail had interacted with Am on numerous occasions prior to this incident, including arresting Am and speaking with Am in relation to gang activity in Lynn. Sergeant Vail also knew that Am had been involved in multiple shootings in Lynn, including a drive-by shooting that took place approximately one year earlier and another shooting on Howard Street that took place only six days earlier (on May 20, 2005).[2] Sergeant Vail further knew that Am had previously been arrested on firearm charges (including the drive-by shooting that took place a year earlier) and that he did not have a license to carry a firearm in Massachusetts.

---

[2] Sergeant Vail was informed by a fellow officer, Detective Robert Hogan of the Lynn Police Gang Unit, that Am was suspected of this shooting on Howard Street. The shooting stemmed from a gang fight between Am's gang (OSB) and a rival street gang in Lynn, the Asian Street Walkers ("ASW"). Sergeant Vail was told that an ASW gang member hit one of Am's friends (also a member of the OSB gang) in the head with a baseball bat. In retaliation for this assault, an OSB gang member shot at the girlfriend of an ASW gang member in an area on Howard Street where ASW members "hung out." The Lynn Police received information that Am was the OSB gang member who fired the shots on Howard Street. Detective Hogan relayed this information to Sergeant Vail before Sergeant Vail and Officer Kmiec saw Am walking on Essex Street on May 26, 2005.

2

Upon seeing Am walking alone on Essex Street in this gang-ridden area, the officers pulled up behind him and stopped their cruiser next to the sidewalk. Knowing the high risk of danger in approaching Am, Sergeant Vail purposely approached with caution, pulling the cruiser up slowly and parking approximately 15-20 feet away from him. They did not activate their blue lights or use the siren. Not only were the officers aware of Am's reputation of being one of the most dangerous gang members in Lynn, but they also knew that gang members like Am do not walk alone in areas frequented by rival gang members without carrying a weapon. This is especially true where feuds are ongoing between rival gangs, which was the case here, as Am was suspected of a retaliatory shooting against the ASW gang only six days earlier.

Upon parking the cruiser, Sergeant Vail and Officer Kmiec opened their doors and stepped out of the car to speak with Am. While doing this, both officers observed that Am noticed them parking and exiting the cruiser. Without being asked to do so, Am did an "about-face" – *i.e.*, he stopped walking in a southerly direction down Essex Street, and instead, turned around and began walking toward the officers. As he did so, Am placed his right hand into his front pants pocket. Both officers observed this action and immediately thought that Am might be reaching for a firearm. Although they did not block his path in any way, such that Am was free to continue walking, Sergeant Vail told Am to take his hands out of his pocket. As Am did so, Sergeant Vail asked him if he had anything on him. Am responded, "I'm strapped." Both officers immediately understood this response to mean that Am was carrying a firearm.

At this point, the officers took control of Am's arms for their safety. As they did so, they asked Am where the gun was located, and Am replied, "front left pocket." Officer Kmiec pat-frisked the area of Am's left front pants pocket and immediately felt a hard object that he believed to be a firearm. Officer Kmiec reached into the pocket and retrieved a Titan .25 caliber pistol loaded with six rounds of ammunition.

3

Upon retrieving the firearm and ammunition, the officers arrested Am for (i) carrying a firearm without a license and (ii) possessing ammunition without a firearm identification card. A license check confirmed that Am did not, in fact, have a license to carry a firearm. Examination of Am's criminal history record also revealed that Am had two adult felony (assault and battery) convictions from 2003.

## II.   ARGUMENT

According to Am, the Court should suppress any and all evidence, including the statements he made on May 26, 2005, on grounds that:

(i) "the stop was conducted without a warrant, without probable cause, without reasonable suspicion ...," *Deft.'s Motion* at 2,

(ii) "[t]he statements made by the defendant ... were obtained as the result of an illegal stop ... in violation of the Fourth Amendment and Fifth Amendment," *id.,* and

(iii) any further evidence obtained as a result of the illegal search and seizure ... is derivative of the illegal stop ... and therefore must be suppressed as 'fruits of the poisonous tree,'" *id*.

For all of the following reasons, the government respectfully disagrees. First, there was no "seizure" of the Defendant triggering any suspicion requirement at any point before Am told the officers that he was "strapped." Instead, the police initiated a "voluntary interaction" with Am, to which he acquiesced by turning around and walking toward them. Second, when Am abruptly turned around and placed his hand in his front pocket in a manner that was indicative of having a gun, the officers had reasonable suspicion to stop and pat-frisk Am for their safety. Third, as soon as Am blurted out that he was "strapped," not only did the officers have reasonable suspicion that Am was engaged in criminal activity, but they had probable cause to believe that he was unlawfully carrying a firearm. For all of these reasons, the officers' actions on May 26, 2005 were entirely justified and Am's motion to suppress should be denied.

     A.     **The Fourth Amendment was Not Triggered Until Am Said He was "Strapped"**

The Fourth Amendment protects persons "against unreasonable searches and seizures." *U. S. Const. amend. IV*. However, "[n]ot all personal intercourse between policemen and citizens involves 'seizures' of persons" implicating the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 19 n.16. A seizure requires either an "application of physical force to restrain movement" or a show of authority to which a suspect submits. *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *United States v. Young*, 105 F.3d 1, 6 (1st Cir. 1997) (observing "in the absence of an officer's exertion of physical force or an individual's submission to a show of authority, no seizure occurs"); *United States v. Sealey*, 30 F.3d 7, 9 (1st Cir. 1994).

The test for the existence of a "show of authority" is objective: whether the officers' words or actions would have conveyed to a reasonable person that he was not free to leave. *Hodari D.*, 499 U.S. at 628; *United States v. Cardoza*, 129 F.3d 6 (1st Cir. 1997). It follows that the Fourth Amendment is not implicated by officers "approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion); *United States v. Velez-Saldana*, 252 F.3d 49, 52 (1st Cir. 2001) (noting an initial stop for questioning need not be based on reasonable suspicion or probable cause); *United States v. Young*, 105 F.3d 1, 6 (1st Cir. 1997). Such interactions are simply "voluntary interactions." *United States v. Regan,* 687 F.2d 531 (1st Cir. 1982). As stated by the First Circuit:

> Police officers, like other citizens, are free to initiate and engage in conversations with citizens. It is only when the police officer either 'by means of physical force or show of authority has in some way restrained the liberty of a citizen...,' Terry v. Ohio, 392 U.S. at 19, n.16, 88 S.Ct. At 1879, n.16, that permissible voluntary interaction becomes transformed into a fourth amendment seizure.

5

*Regan,* 687 F.2d at 535.

The First Circuit has applied the Supreme Court's definition of "seizure" in many different circumstances. In *United States v. Cardoza*, 129 F.3d 6 (1st Cir. 1997), for example, the First Circuit affirmed a district court's denial of a motion to suppress, finding that there was no police show of authority (and therefore no seizure) where the officers did not use sirens or flashing lights to indicate that they wanted the suspect to stop walking down the street. Instead, the officers simply pulled over to the curb, stopped the cruiser, and one officer initiated interaction with the defendant while the other officers remained in the cruiser, none of whom asked the defendant to stop or approach the cruiser. *Cardoza*, 129 F.3d at 16.

Similarly, in *United States v. Smith*, 423 F.3d 25, 30-32 (1st Cir. 2005), *cert. denied, Smith v. United States*, 2006 U.S. LEXIS 4001, the First Circuit concluded that the defendant had not been "seized" where the officers did not use the cruiser's sirens or lights, kept their weapons holstered at all times, never made contact with the defendant or accused him of any crime, did not use an overly aggressive tone of voice, and did not restrict the defendant's freedom of movement as they approached him. *See also Michigan v. Chesternut*, 486 U.S. 567, 574 (1988) (finding no seizure where "record [did] not reflect that the police activated a siren or flashers; or that they commanded respondent to halt, or displayed any weapons; or that they operated the [police cruiser] in an aggressive manner to block respondent's course"); *United States v. Mendenhall*, 446 U.S. 544, 555 (1980) (enumerating non-exhaustive list of circumstances that might indicate seizure as (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled).

Such is the case here. Although Sergeant Vail and Officer Kmiec were in a marked cruiser, they did not activate their blue lights or use the siren to get Am's attention. Instead, they purposely approached Am with caution, pulling up to the curb slowly and parking approximately 15-20 feet away from him. Neither officer ordered Am to come to them or restrained his liberty by means of force or show or authority. Instead, Am turned around and walked toward them on his own volition. As set forth above, Am was very familiar with Sergeant Vail and had talked to him on numerous occasions in the past. The officers never took out their weapons, made any threatening gestures as Am approached them, or blocked his path in any way.

As Am walked toward them, they did not accuse him of any criminal activity or say anything whatsoever until Am placed his hand in his pocket in a manner indicative of carrying a weapon. At this point, the officers simply told Am to take his hands out of his pocket (which he did) and asked him if he was carrying anything. Am immediately replied that he was "strapped," at which point the officers took hold of his arms. This entire exchange took place within seconds. The moment that Am stated that he was "strapped," the officers understood that he was carrying a firearm. At this point, the officers took control of Am's arms for their safety, thereby preventing Am from using the firearm in his pocket. In light of the facts and law discussed above, however, until Am stated that he was "strapped" and the officers took hold of his arms, Am was not "seized" and Fourth Amendment protections remained inapplicable. *See Mendenhall*, 446 U.S. at 553-55 (affirming the view that a person is seized only when his freedom of movement is restrained); *Chesternut*, 486 U.S. at 575; *Cardoza*, 129 F.3d at 16; *Smith*, 423 F.3d at 30.

**B.     The Stop was Based on Reasonable Suspicion of Criminal Activity**

Even if the Fourth Amendment was implicated here, reasonable suspicion of criminal activity justified the officers' actions. Specifically, when Am stopped walking in a southerly

7

direction down Essex Street and did an "about-face" and began walking toward the officers, placing his hand in his front pocket, the officers had reasonable suspicion to believe that Am was carrying a weapon, justifying a *Terry* stop and frisk. This is especially true given the circumstances surrounding these actions, including: (i) Am was walking alone; (ii) down Essex Street, which is a high-crime, gang-ridden area; (iii) at a time when he was suspected of having shot at someone associated with a rival gang; and (iv) officers knew that Am was one of the most dangerous gang members in Lynn, who had been arrested in the past for violent crimes, including firearms violations.

A brief investigatory detention, or *Terry* stop, is permissible under the Fourth Amendment if the stop is justified by reasonable suspicion of criminal activity. *See Terry v. Ohio*, 391 U.S. 1, 30 (holding police can stop and briefly detain person for investigative purposes if officer has reasonable suspicion, supported by articulable facts, of criminal activity); *United States v. Sokolow*, 490 U.S. 1, 7-12 (1989) (elaborating on meaning of "reasonable suspicion"); *United States v. Monteiro*, 447 F.3d 39, 43 (1st Cir. 2006). This suspicion must be based on "specific and articulable facts." *United States v. Hensley,* 469 U.S. 221, 226 (1984), citing *Prouse*, 440 U.S. at 653-55. As stated by the Supreme Court:

> [T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause. The officer, of course, must be able to articulate something more than an inchoate and unparticularized suspicion or hunch. The Fourth Amendment requires some minimal level of objective justification for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means a fair probability that contraband or evidence of a crime will be found, and the level of suspicion for a *Terry* stop is obviously less demanding than that for probable cause[.]

*United States v. Sokolow*, 490 U.S. 1, 7 (1989); *see also United States v. Woodrum*, 202 F.3d 1, 6-7 (1st Cir. 2000) (officer must be able to articulate something more than an unparticularized

and inchoate suspicion or hunch).

"In evaluating whether reasonable suspicion exist[s,]" a court looks at the "totality of the circumstances ... to see whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing." *Monteiro*, 447 F.3d at 43, quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Officers may draw on their "own experience and specialized training to make inferences from and deductions about the cumulative information ... that might well elude an untrained person." *United States v. Jones*, 432 F.3d 34, 40 (1st Cir. 2005), quoting *Arvizu*, 534 U.S. at 273.

Here, it is clear that such reasonable suspicion, grounded on specific and articulable facts, existed. As noted above, the following facts existed at the time in question:

- The officers knew that Am was a member of the local OSB gang, a violent gang in Lynn, and was considered was one of the most dangerous gang members in Lynn;

- Sergeant Vail was also aware that Am carried weapons, including guns, and had been involved in multiple shootings in Lynn, including the shooting on Howard Street that took place only six days earlier;

- Sergeant Vail further knew that Am had previously been arrested on firearm charges (including a drive-by shooting that took place a year earlier) and that he did not have a license to carry a firearm in Massachusetts;

- Am was walking in a high-crime, gang-ridden area;

- Am was walking in this area alone, and the officers knew based on their training and experience that gang members like Am do not walk alone in areas frequented by rival gang members without carrying a weapon, especially during times of tension between rival gangs, which officers understood to be the case here;

- As the officers stepped out of the cruiser, Am did an "about-face," began walking toward the officers, and placed his hand into his front pants pocket in a manner that made both officers fear that he had a firearm in his pocket.

9

Under a totality of the circumstances analysis, *Monteiro*, 447 F.3d at 43, these facts created a reasonable suspicion by both officers that Am was carrying a firearm. They were therefore fully justified in investigating that belief to protect their safety and to determine if Am was, in fact, engaged in criminal activity. *See Illinois v. Wardlow*, 528 U.S. 119 (2000) (noting presence in "high crime area" relevant for *Terry* stop analysis); *Jones*, 432 F.3d at 40 (allowing officers to use their experiences and knowledge to determine reasonable suspicion); *Hensley*, 469 U.S. at 229 (permitting stop based on reasonable suspicion that suspect involved in or wanted for crime); *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) ("protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger ... and that danger may arise from the possible presence of weapons in the area surrounding a suspect"). It is well settled that *Miranda* warnings are not required under such circumstances. *See, e.g., United States v. Fornia-Castillo*, 408 F.3d 52, 63 (1st Cir. 2005) (investigatory *Terry* stops "though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates *Miranda* warnings"); *Streifel*, 781 F.2d at 958.

In sum, Sergeant Vail and Officer Kmiec had reasonable suspicion to believe that Am was carrying a weapon, justifying the brief *Terry* stop and frisk that took place here. *See Terry* 392 U.S. at 20-21. The defendant's motion to suppress the firearm and statements should therefore be denied.[3]

---

[3] A *Terry* stop was also justified here based on the officers' reasonable suspicion that Am had been involved in the Howard Street shooting six days earlier. It is well settled that police may stop and investigate a person based on a reasonable suspicion that the person "was involved in or wanted in connection with a completed felony." *See United States v. Hensley*, 469 U.S. 221, 229 (1985); *United States v. Kimball*, 25 F.3d 1, 6 (1st Cir. 1994) (noting officer's knowledge of prior criminal activity relevant to determination of whether criminal activity afoot). Here, Sergeant Vail had been informed that Am was suspected of firing the shots that

**C.      The Officers Also Had Probable Cause to Effect the Search and Seizure**

Finally, as soon as Am blurted out that he was "strapped," not only did the officers have reasonable suspicion that Am was engaged in criminal activity, but they had probable cause to believe that he was unlawfully carrying a firearm. As described above, the moment that Am replied that he was "strapped," the officers understood that he was carrying a gun. They also knew from prior dealings with Am that he was a convicted felon and could not legally carry a firearm. They therefore had probable cause to believe that he was engaged in criminal activity and could arrest and search him incident to the arrest. *See Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (discussing probable cause requirement); *Atwater v. Lago Vista*, 532 U.S. 318 354 (2001) ("[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender").*Chimel v. California*, 395 U.S. 752 (1969) (instructing that "[t]he right without a search warrant contemporaneously to search persons lawfully arrested ... is not to be doubted"); *United States v. Cruz Jimenez*, 894 F.2d 1, 7 (1st Cir. 1990) ("a search incident to a valid arrest may be made without procurance of a warrant").

---

took place on Howard Street on May 20, 2005. He and Officer Kmiec therefore had reasonable suspicion to believe that Am had been involved in criminal activity (based on (i) the information relayed to Sergeant Vail prior to this incident and on (ii) the fellow officer / collective knowledge doctrine). *See United States v. Cook*, 277 F.3d 82, 85 (1st Cir. 2002) (noting where law enforcement officers are jointly involved in executing investigative stop, knowledge of each officer is imputed to others for purposes of determining validity of stop); *United States v. Meade*, 110 F.3d 190, 193 (1st Cir. 1997) (under "collective knowledge" doctrine, also known as the "fellow officer" rule, "law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime").

### III.   CONCLUSION

For all of the foregoing reasons, Defendant Samnang Am's Motion to Suppress should be denied.

Dated:   September 1, 2006

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:   */s/ Lisa M. Asiaf*
LISA M. ASIAF
Assistant U.S. Attorney
Tel:  (617) 748-3268

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 1, 2006.

*/s/ Lisa M. Asiaf*
LISA M. ASIAF