UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 05-10226-RWZ

UNITED STATES OF AMERICA

v.

SAMNANG AM, a/k/a SAMMANG AM

ORDER ON PRETRIAL MOTION

February 8, 2007

ZOBEL, D.J.

Defendant Samnang Am ("Am") is charged in a one-count indictment with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). (Docket # 10). He now moves to suppress the gun seized from his person, along with statements he made to the police, during the course of a stop and search by Lynn Police officers on May 26, 2005. (Docket # 32). Based on the parties' papers and the testimony of the arresting officers and defendant, the motion to suppress both the evidence seized and statements made to the police is denied for the reasons discussed below.

I.  **Findings of Fact**

At approximately 6:55 p.m. on May 26, 2005, defendant Am was walking alone down Essex Street toward Joyce Street in Lynn, Massachusetts. Am was on probation in connection with a previous conviction and was headed to a regular meeting of his mandatory anger management course, whose office was on Union Street.

Patrolling the area that night in uniform in a marked police cruiser were Sergeant Michael Vail ("Vail") and Officer Michael Kmiec ("Kmiec") of the Lynn Police Department. Vail was a supervisor in the patrol division, which assisted the Gang Unit in patrolling Lynn. Kmiec was a patrolman in Vail's division. According to both officers, this part of Lynn was a "high crime area" in which "frequent" shootings occurred and which was the subject of increased police patrols as part of the police department's "gang suppression" or anti-gang strategy.

Sergeant Vail regularly patrolled the area and over time had numerous (approximately 20-30) interactions with Am. Vail would regularly see Am around the neighborhood and ask whether Am had any information. Vail knew that Am was the leader or "shot caller" of a gang calling themselves the "Oriental Street Boys," a Massachusetts affiliate of the Los Angeles-based Crypts, and suspected that he had been involved in one or more shootings in Lynn. Vail knew that Am had a reputation for carrying a weapon. He also knew that Am was on probation and was prohibited by the terms of his probation from doing so.

In addition, Vail testified that just prior to his encounter with Am, he spoke with Detective Robert Hogan of the Lynn Police Gang Unit, who informed Vail that Am was a suspect in a shooting that had taken place on Howard Street six days earlier on May 20, 2005. Minutes later, as their vehicle proceeded northerly on Essex Street, Vail and Kmiec came upon Am walking alone southerly on Essex Street. Vail surmised that Am would not risk walking alone in that part of town without a weapon. Upon seeing Am, Vail did a u-turn on Essex Street and, without using his flashing lights or siren, pulled

his police cruiser up behind Am.  He stopped the cruiser somewhere between five and fifteen feet from Am, and both Vail and Kmiec began to get out of the car.  Am then did an "about-face" and walked toward them.  Am put his right hand in his right pants pocket in a quick motion, and Vail ordered Am to take his hand out of his pocket.  Am complied.  What occurred next is the subject of much dispute.

According to Vail, he asked Am: "Do you have anything on you?" to which Am replied: "I'm strapped."  Am denies having said this.  Am testified that the officers pulled their unmarked police cruiser up behind him with a slight screech of the tires, and that he was startled.  He further testified that they stopped their car two to three feet from him.  He turned around and asked "What [the] [expletive] you doing?" at which point, Sergeant Vail ordered him to: "shut up.  Put your hand[s] on the hood."  He testified that he did not put his hand in his pocket, but that, without provocation, Sergeant Vail threw him against the hood of the police cruiser, searched him, found the gun and arrested him.  During the pat-down frisk, during which no Miranda warnings were given, Kmiec asked Am: "Where is the gun?" to which Am replied: "Front left pocket."  Kmiec found a FIE Titan .25 caliber pistol and six rounds of PMC .25 automatic ammunition in Am's front left pants pocket.

Regardless whether Am made the statements at issue, I am persuaded that, given the officers' historical knowledge and reasonable contemporaneous perceptions, the officers correctly, properly and reasonably suspected defendant was armed.  I note, however, that it is not clear why, given what the officers knew about Am, they would have first asked him: "Do you have anything on you?" prior to pat-frisking him, nor that

3

Am would have volunteered: "I'm strapped." However, it is hardly surprising that, in light of the almost year and one-half delay between the arrest and the suppression hearing, differences in memory would result in some differences in the accounts of the several witnesses (for example, whether or not the police cruiser was marked and whether Essex and Union intersected).

## II. Conclusions of Law

### A. Motion to Suppress Evidence Seized

Am now moves to suppress the weapon seized by Sergeant Vail and Officer Kmiec. The principle question, then, is whether the officers had reasonable suspicion to stop and search Am.

#### 1. Reasonable Suspicion Justifying the Stop and Search

In general, police may conduct a warrantless search and seizure of an individual only if they have probable cause to believe that a crime has been committed. However, in Terry v. Ohio, 392 U.S. 1 (1968), the U.S. Supreme Court carved out an exception to this rule, permitting the police to stop and search individuals "based on a reasonable suspicion that criminal activity is afoot and to frisk the detained citizen if they have a reasonable belief the person is armed." United States v. McKoy, 402 F. Supp. 2d 311, 313 (D. Mass. 2004); see also United States v. Moore, 235 F.3d 700, 703 (1st Cir. 2000) (same). Reasonable suspicion must be based on "specific and articulable facts." United States v. Hensley, 469 U.S. 221, 226 (1984) (internal citations omitted). Moreover, due to the brevity of the stop and search and its minimal intrusion, the "reasonable suspicion" standard is a less demanding standard than the "probable

cause" standard needed to conduct a warrantless search.  See Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000).

Whether an officer has "reasonable suspicion" turns on consideration of "the totality of the circumstances of each case to see whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing." United States v. Montiero, 447 F.3d 39, 43 (1st Cir. 2006).  Finally, the totality of the circumstances are viewed "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000).

Here, the government argues that, given the totality of the circumstances, it had reasonable suspicion to stop Am.  In particular, it points to the following factors: (1) Am was present in a "high crime" area, known to the officers to be a location where gang violence and drug deals frequently occurred; (2) they suspected that Am was a "shot caller" in the "Oriental Street Boys" gang; (3) they knew that Am had previous convictions for violent offenses; (4) they knew that Am had a reputation for carrying a weapon and further suspected that he would not walk alone in the neighborhood that he was in without a weapon; (5) they knew that he was on probation and prohibited from carrying a weapon; and (6) Vail learned that Am was a suspect in a recent shooting in the area during his phone conversation with Detective Hogan.

Courts have held that, while not dispositive, "a location's characteristics are relevant in determining whether an individual's behavior is sufficiently suspicious to warrant further investigation." United States v. Smith, 332 F. Supp. 2d 277, 285 (D.

5

Mass. 2004), overruled on other grounds, 423 F.3d 25 (2005). Accord, United States v. Lenoir, 318 F.3d 725 (7th Cir. 2003) (concluding that defendant's presence in "high crime area" combined with other factors created reasonable suspicion); United States v. Granger, No. 93-5595, 1994 WL 463422, at *2 (4th Cir. Aug. 29, 1994) ("the nature of the area cannot be the only factor justifying the investigatory stop . . . but it is one factor which an officer may appropriately consider") (emphasis in original); cf. Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (an individual's mere presence in a "high crime area," without more, does not meet the standard for particularized suspicion of criminal activity required by Terry).

  In addition, courts have held that police officers' beliefs that a defendant may be carrying a weapon illegally may give rise to reasonable suspicion under Terry. See, e.g., United States v. Stanley, 915 F.2d 54, 57 (1st Cir. 1990) (Terry stop justified "based on [officer's] suspicion of drug-related activities and [] knowledge that individuals engaged in such activity often carry firearms.").

  Moreover, it is well-established law that "[a] police officer's knowledge of an individual's prior criminal activity is material to whether the officer reasonably suspects that criminal activity has or may be occurring." United States v. Kimball, 25 F.3d 1, 7 (1st Cir. 1994). For example, in United States v. Hart, 334 F. Supp. 2d 5 (D. Mass. 2003), the court found that the arresting officers had reasonable suspicion to believe Hart was carrying a weapon illegally because "[they] had good reason to believe that Hart was the target of a rival gang and that he would be carrying a weapon in order to protect himself . . . The police knew that members of [defendant's gang] had access to

6

firearms and, at times, carried them." Id. at 10. Defendant attempts to distinguish Hart, but I conclude that the Hart court's reasoning compels the same result in this case as well:

> [The officer] also knew that Hart was not eligible to have had a license to carry a firearm. Therefore, if he were carrying one for protection it would be illegal. Thus, the police had the constitutionally required reasonable, articulable suspicion that Hart was committing a crime necessary to justify a stop under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Accordingly, the police were justified in briefly stopping Hart to investigate their suspicions.

Hart, 334 F. Supp. 2d at 11.[1]

Finally, Vail had just received information from Detective Hogan that Am himself was a suspect in a shooting that had taken place six days earlier. It is well-settled law that the police may conduct a Terry stop so long as they have a "reasonable suspicion . . . that a person they encounter was involved in or is wanted in connection with a completed felony." United States v. Hensley, 469 U.S. 221, 229 (1985).

Like the officers in Hart, the officers here had reasonable suspicion to stop Am in light of the totality of the circumstances. Accordingly, I find that the officers here had

---

[1] Defendant also relies heavily on United States v. Weaks, No. 05-10242-REK, 1995 U.S. Dist. LEXIS 20015 (D. Mass. Dec. 21, 1995). This case is inapposite. In that case, the court granted defendant's motion to suppress evidence and statements obtained by police during the course of a stop and search of a taxicab in which defendant was riding. Police officers observed Weaks in the back seat of a moving taxicab on a public road. Upon seeing the officers, Weaks allegedly covered his face, looked back at the officers and disappeared from their view in an evasive maneuver. The court held that these actions were not enough to allow the officers to form the "reasonable suspicion" of criminal activity required by Terry, but rather that "[defendant's actions] support[ed] only an inference of an effort by the defendant to avoid police." Id. at *9. Unlike Weaks, Am's behavior during his encounter with the police is largely irrelevant. Rather, the police had "reasonable suspicion" of criminal activity based on their knowledge of Am's past actions and the information conveyed to them that Am was a suspect in a recent shooting.

reasonable suspicion to stop and frisk Am under Terry.

### 2. Legality of the Pat-Down Frisk

The reasonable suspicion that permitted the police to stop Am does not automatically give police the authority to frisk him attendant to that search. See United States v. McKoy, 402 F. Supp. 2d 311, 314 (D. Mass. 2004) ("the justification for stopping [a citizen] . . . does not ineluctably satisfy the further requirements for frisking him"). Rather, it is only where there is "an objectively reasonable belief that the subject is armed and dangerous." Id.

Here, the officers had such an objectively reasonable belief based on the same factors that gave rise to their reasonable suspicion that Am was engaged in criminal activity. In addition, the police had justification to search Am after Am thrust his hand into his pants pocket in a quick motion. At that point, the officers could have reasonably believed that Am might be armed and thereby present a danger to their safety. See United States v. Stanley, 915 F.2d 54, 57 (1st Cir. 1990) (affirming district court's denial of defendant's motion to suppress gun seized, concluding that officers were justified in searching defendant where he ignored officers' command to "freeze" and made a quick lunging motion toward passenger side of car).

### 3. Existence of Probable Cause to Make an Arrest

Next, Am argues that the police did not have probable cause to arrest him. Probable cause exists "when, given all the circumstances, there is a fair probability that contraband or other evidence will be found." United States v. Samboy, 433 F.3d 154, 160 (1st Cir. 2005) (internal quotation omitted). As noted above, the officers satisfied

the lower standard of "reasonable suspicion" to conduct a valid Terry stop and pat-down frisk. That frisk revealed the presence of a gun at which point "reasonable suspicion" became probable cause required for the officers to arrest Am. See, e.g., United States v. Henley, 469 U.S. 221, 236 (1985) (noting that "the discovery of the gun ripened what had been merely reasonable suspicion into the full-scale probable cause necessary for an arrest"); United States v. Taylor, 857 F.2d 210, 214 (4th Cir. 1988) ("With the discovery of the heroin, the reasonable suspicion that justified the investigative stop ripened into probable cause to arrest [defendant].").

**B.    Motion to Suppress Statements Made to Police**

Finally, defendant seeks to suppress two statements allegedly made to the police during the stop ("I'm strapped" and that the gun was in his "front left pocket"). Regardless whether Am made the statements at issue (and I conclude the he did not do so), the statements are nevertheless not subject to suppression because Am was not the subject of "custodial interrogation" when the statements were made. It is axiomatic that, "[a]s a general rule, Terry stops do not implicate the requirements of Miranda, because Terry stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates Miranda warnings." United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001) (internal citations omitted). While "a valid investigative stop can escalate into custody," also United States v. Brito-Melo, No. 05-10227-PBS, 2006 WL 2559860 (D. Mass. Sept. 5, 2006), that is not what happened here. Here, the encounter occurred in neutral territory -– on a public street. See United States v. Trueber, 238 F.3d 79, 93 (1st Cir.

9

2001). In addition, Am allegedly made the statement prior to his being frisked by the officers. He was neither in handcuffs nor told he could not leave. The stop lasted less than twenty minutes. Accordingly, under the circumstances, I conclude that the investigatory stop did not rise to the level of a <u>de facto</u> arrest requiring the recitation of <u>Miranda</u> warnings.

### III.      Conclusion

Accordingly, defendant's Motion to Suppress Evidence and Statements (Docket # 32) during the stop and search is hereby DENIED.

|  |  |
|---|---|
| February 8, 2007 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |